## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF PUERTO RICO

IN RE:

**COCO BEACH GOLF & COUNTRY CLUB, S.E.**

    **Debtor**

**CASE NO. 15-05312(ESL)**

**CHAPTER 11**

---

### MOTION FOR ENTRY OF ORDER (I) AUTHORIZING DEBTOR TO OBTAIN SECURED POSTPETITION FINANCING PURSUANT TO 11 U.S.C. §§ 105, 361, 362, 363(B), 364(C)(1), 364(C)(2), 364(C)(3), 364(D)(1) AND 364(E), AND (II) GRANTING RELATED RELIEF

Coco Beach Golf & Country Club, S.E. ("Debtor"), by its undersigned counsel, submits this motion (the "Motion") for entry of an order (i) authorizing Debtor to obtain secured post-petition financing pursuant to Sections 105, 361, 362, 363(b), 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1) and 364(e) of title 11 of the United States Code, 11 U.S.C. §§ 101, et seq. (the "Bankruptcy Code"), Rules 2002, 4001 and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and the corresponding Local Rules for the United States Bankruptcy Court for the District of Puerto Rico (the "Local Rules"). In support thereof Debtor states as follows:

### JURISDICTION

1.     The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2). Venue of this case and the Motion in this District is proper pursuant to 28 U.S.C. §§ 1408 and 1409. The statutory and legal predicates for the relief requested herein are Sections 105, 361, 362, 363, and 364 of the Bankruptcy Code and Bankruptcy Rules 2002, 4001 and 9014.

## BACKGROUND

2.      On July 13, 2015 (the "Petition Date"), the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code and, since that date, has managed its affairs and operated its business as a debtor in possession, pursuant to Sections 1107 and 1108 of the Bankruptcy Code.

3.      Debtor owns two 18-hole golf courses and country club facilities operated under the name Trump International Golf Club Puerto Rico (the "Golf & Country Club").

4.      The signature event at the Golf & Country Club is the Puerto Rico Open, an official FedEx Cup tournament on the Professional Golf Association ("PGA") Tour, which has been held on March at the Golf & Country Club since 2008. The Puerto Rico Open is the first, and remains the only, PGA Tour tournament held in Puerto Rico.

5.      In addition to being an important event for the Golf & Country Club, the Puerto Rico Open, which is sponsored by The Puerto Rico Tourism Company, is an important event for the local economy, as it annually results in the occupancy of nearly 2,000 hotel rooms and has an estimated $22 million impact thereon. Moreover, the Puerto Rico Open places Puerto Rico in the international spotlight, giving sports enthusiasts the opportunity to learn about the Island.  The Puerto Rico Open is broadcasted by the Golf Channel, enabling the local event to reach nearly 630 million homes in 220 countries.

6.      Also, the Puerto Rico Open is a unique charitable event that gives back to the community.  The tournament has raised over $2,000,000 in charitable funds over its first eight years.  Among other things, these funds have been used to send

deserving children to college, develop music programs for the under privileged, and for working with the elderly.

7.      Prior to the filing of its Chapter 11 case, Debtor commenced experiencing a substantial diminution in its cash flow due to Puerto Rico's critical economic situation, which has impacted the tourism sector of the Island. This situation, together with Debtor's inability to generate sufficient income to remain competitive in today's marketplace, resulted in Debtor's need to sell the Golf & Country Club in order to maximize the value of its assets for the benefit of creditors and the bankruptcy estate.

8.      To that end, on the Petition Date, Debtor filed a *Motion for the Entry of Orders: (A) Approving the Asset Purchase Agreement and Sale of Certain of the Debtor's Assets, Pursuant to Section 363 and 365 of the Bankruptcy Code, Free and Clear of All Liens, Claims, Interests and Encumbrances, and (B) Approving the Bidding Procedures to Solicit Higher and Better Offers and Select the Successful Bidder* (Docket No. 4) (the "Sale Motion"). By the Sale Motion, Debtor requested the Court to, among other things, approve certain Bidding Procedures (the "Bidding Procedures") governing the marketing and sale of Debtor's assets, if necessary, at a public auction (the "Auction"), and to schedule a hearing (the "Sale Hearing") to consider approving the sale of substantially all of Debtor's assets (the "Sale").

9.      On September 2, 2015, the Court entered the *Amended Order (A) Approving the Bidding Procedures to Solicit Higher and Better Offers and Select the Successful Bidder, for the Sale of Substantially all of the Debtor's Assets, (B) Scheduling a Final Sale Hearing and Approving the Form and Manner of Notice*

*Thereof and (C) Granting Related Relief* (Docket No. 57) (the "Bidding Procedures Order").

10.     Pursuant to the Bidding Procedures and the Bidding Procedures Order, the deadline to submit qualified bids to purchase the Debtor's assets is November 16, 2015; the Auction, if necessary, to be held on November 23, 2015; and the Sale Hearing on December 3, 2015.

11.     As further described in the Sale Motion, prior to the Petition Date, Debtor and OHorizons Global, LLC ("OHorizons") negotiated a stalking horse asset purchase agreement (the "APA" attached as Exhibit A to the Sale Motion).  If no higher or better offers for Debtor's assets are realized through the Bidding Procedures and the Auction, if necessary, the Sale Motion asks the Court to approve the APA and the sale of the Purchased Assets (as defined in the APA) to OHorizons at the Sale Hearing.  Debtor believes that the best way to maximize the value of its estate for the benefit of creditors, and ensure the continued operations of the Golf & Country Club for the benefit of all parties in interest, is to conduct the sale of the Purchased Assets to OHorizons or a third party submitting a competing proposal with superior terms.  See Mr. Jorge L. Díaz Irizarry's declaration attached to the Sale Motion as Exhibit A-1.

## NEED FOR FINANCING

12.     Debtor has a critical need to access post-petition debtor-in-possession financing.  To ensure maximum value is realized through the sale of the Purchased Assets, Debtor believes, in its business judgment, that it must continue operating, preserve and enhance the condition of the Golf & Country Club and otherwise maintain its business as a going concern.  Unfortunately, Debtor does not have

sufficient cash flow from its operations to pay vendors for ongoing, post-petition services that are vital to the maintenance of the golf courses and the provision of other services to members and guests of the Golf & Country Club, including, without limitation, groundskeepers, food vendors, other service providers, and employees. Additionally, Debtor cannot fund necessary maintenance and improvements to the Golf & Country Club, including expenditures requested by the PGA. The need for post-petition financing recently has become more critical, as the period originally contemplated for the conduct of the bidding process and the Sale has been extended beyond the period Debtor had planned prior to the Petition Date.

13.     Debtor is struggling to maintain the Golf & Country Club in a suitable manner, and the condition of the golf courses is quickly deteriorating. By way of example, water features and ponds on the golf courses are not being adequately maintained and, thus, are gradually being taken over by vegetation. In addition to landscaping, Debtor needs to make necessary repairs and improvements to the clubhouse and other facilities.

14.     Debtor understands that the PGA is re-evaluating holding the Puerto Rico Open at the Golf & Country Club in the spring of 2016 due to Debtor's inability to maintain and enhance the condition of the Golf & Country Club. Debtor is concerned that if it is unable to promptly obtain and spend the funds necessary to maintain and enhance the condition of the Golf & Country Club, the 2016 Puerto Rico Open could be jeopardized. Debtor submits that the loss of the Puerto Rico Open would be devastating to the Golf & Country Club, the local community and the economy of Puerto Rico.

Coco Beach Golf & Country Club, SE                                    Case No. 15-05312(ESL)
*"Motion For Entry Of Order…"*                                                      *Page 6*

15.    Recognizing the immediate need for cash, Debtor considered a number of avenues for potential debtor-in-possession financing. Ultimately, Debtor concluded that the only party who would and could provide the necessary financing within the required time frame is OHorizons, given its intention to acquire the Golf & Country Club through the Sale. Debtor began negotiations with OHorizons, which negotiations culminated in the DIP Credit Agreement (as defined below). Pursuant to the DIP Credit Agreement, OHorizons Global, LLC (the "DIP Lender") has agreed to lend $3,700,000 to Debtor on a senior secured, superpriority basis. Debtor is seeking the consent of TDF, the holder of a secured mortgage lien on the Golf & Country Club, to the priming of its prepetition liens as will be provided in the DIP Credit Agreement and the proposed form of order granting this Motion, attached hereto as **Exhibit A** (the "Order"). Debtor has been advised that such consent will be provided prior to the hearing on this Motion.

16.    Debtor has been unable to obtain financing on terms better than the DIP Credit Agreement due to, among other factors, its current financial condition, its lack of unencumbered assets and the requirement that the financing be obtained promptly so that the maintenance and improvement expenditures can commence. Debtor believes, in its business judgment, that entering into the DIP Credit Agreement is necessary so that it can continue to operate its business and preserve and enhance the value of Debtor's assets pending the Sale.

## PREPETITION SECURED INDEBTEDNESS

17.    Debtor was financed through the issuance of Tourism Revenue Bonds with the Golf & Country Club as a guarantee. Debtor is the borrower under that certain Loan Agreement with the Puerto Rico Industrial Tourist, Educational, Medical

and Environmental Control Facilities Financing Authority (the "Authority"), dated as of March 30, 2011 (the "Loan Agreement").    In connection with the Loan Agreement, the Authority entered into that certain Trust Agreement with Banco Popular de Puerto Rico (the "Trustee"), dated as of the same date, pursuant to which the Authority assigned all of its right, title and interest in and to the Loan Agreement to the Trustee.    Under the Loan Agreement, the Authority agreed to issue and sell $26,115,000 of Tourism Revenue Refunding Bonds, 2011 Series A (Trump International Golf Club Puerto Rico Project) (the "Bonds") and loaned Debtor the proceeds, which were used to refund two prior Authority bond issuances used to finance a portion of the construction of the Golf & Country Club.  Debtor is obligated under the Loan Agreement to pay the principal amount of, and accrued interest on, the Bonds when they become due and payable.  To secure its obligation to make such payments under the Loan Agreement, Debtor entered into that certain Letter of Credit and Reimbursement Agreement (the "Reimbursement Agreement") with TDF, pursuant to which TDF issued a Letter of Credit (the "Letter of Credit") to the Trustee to provide security for the payment of the amounts due the Trustee under the Loan Agreement—the principal of, and interest accrued on the Bonds.  Under the Reimbursement Agreement Debtor is obligated to reimburse TDF for any amounts drawn on the Letter of Credit by the Trustee to pay bondholders.    Debtor's obligations under the Reimbursement Agreement are secured by pledges and assignments of certain of Debtor's contracts, depository accounts, rents, licenses and proceeds thereof (among other things), and a mortgage on the real property on which the Golf & Country Club was developed (collectively, the "Prepetition Liens").

18.    As of the Petition Date, the aggregate amount outstanding under the Reimbursement Agreement was $32,606,821.36.

19.    Debtor does not have sufficient unencumbered cash with which to operate the Golf & Country Club or undertake necessary maintenance and improvements to the premises.  As a result, Debtor has an immediate need for financing which, given the circumstances, can only be obtained through a senior secured, priming debtor-in-possession financing facility.

## RELIEF REQUESTED

20.    Debtor requests the entry of the Order authorizing:[1]

(a)    Debtor to obtain senior secured post-petition financing (the "Financing"), consisting of a secured superpriority new money debtor in possession facility in an aggregate principal amount not to exceed $3,700,000 (the "DIP Loans"):

(b)    Debtor to execute DIP Credit Agreement, which shall contain terms incorporating the material terms and conditions set forth in debtor in possession financing facility term sheet attached hereto as **Exhibit B** (including all amendments thereto, the "DIP Credit Agreement" and collectively with any other related agreement, instrument or other document delivered or executed in connection with the DIP Credit Agreement, including the "Budget" and the "Loan Documents" (as defined in the DIP Credit Agreement), the "DIP Documents"), by and among Debtor, as Borrower, and OHorizons Global, LLC or its designee, as DIP Lender;

(c)    Debtor to execute and enter into the related DIP Documents and perform such other and further acts as may be required in connection with the DIP Documents;

(d)    Debtor's waiver of any right to surcharge against collateral, including the Collateral (as defined in the Order) under Section 506(c) of the Bankruptcy Code; and

(e)    modification of the automatic stay imposed under Section 362 of the Bankruptcy Code to the extent necessary to implement and

---

[1]    The terms and conditions of the DIP Credit Agreement and Order set forth in this Motion provide the Court and interested parties with an overview of the significant terms thereof.  In the event there is a conflict or inconsistency between this Motion and the relevant operative documents, the operative documents shall control in all respects.

effectuate the terms and provisions of the DIP Documents and the Order.

**A.  Local Rule 4001-2 Disclosures Regarding the DIP Facility**

21.  Disclosures required by Local Rule 4001-2 in connection with seeking authorization to obtain credit:

| Rule | Disclosure |
|---|---|
| 4001-2(a)(1): Total dollar amount | Up to $3,7000,000 |
| 4001-2(a)(2): Specific uses of the funds | Working capital needs, necessary maintenance and improvement expenses and Debtor's general corporate purposes |
| 4001-2(a)(3): Proposed budget | A copy of the Budget is attached hereto as Exhibit C. |
| 4001-2(a)(4): Amount of debt owed to creditor claiming an interest in the collateral | See "Prepetition Indebtedness" described *infra* at ¶ 9. |
| 4001-2(a)(5): Value of collateral that secures the creditor's asserted interest | To be determined through the competitive Sale process. |
| 4001-2(a)(6): Adequate protection | Debtor believes, based upon information received as to discussions with TDF, that TDF will consent to being primed and is adequately protected through the Debtor's use of the DIP Financing, which would not be available absent TDF's consent, to maintain and enhance the value of the Golf & Country Club pending completion of the Sale. |
| 4001-2(a)(7): Carve-out | The DIP Lender's liens on the Collateral and claims, including any Superpriority Claims, and (ii) the liens, security interests and claims of TDF, shall be subject to a carve out (the "Carve-Out") in an amount not to exceed: (A) all accrued but unpaid professional fees and disbursements of professional persons retained by Debtor by order of this Court and payable under Sections 328, 330 and/or 331 of the Bankruptcy Code |

| | (collectively, the "Professional Expenses") incurred by Debtor prior to the occurrence of a Carve-Out Event, <u>provided</u> that such amount shall not exceed the amounts set forth in the Budget for such items through the occurrence of such Carve-Out Event, plus (B) fees incurred and payable to the clerk of the Bankruptcy Court and to the U.S. Trustee pursuant to 28 U.S.C. § 1930, to the extent such fees were incurred prior to delivery by the DIP Administrative Agent to Debtor of a notice of an Event of Default.  In no event shall any of the Carve-Out be used to pay any fees or expenses of any person retained in a chapter 7 case under Section 326, 327 or 328 of the Bankruptcy Code.  Notwithstanding the foregoing, no portion of the Carve-Out and no portion of any amounts approved for payment prior to an Event of Default shall be utilized in a manner prohibited under the DIP Credit Agreement and paragraph 16 of the Order. |
|---|---|

## B.   <u>Other Significant Provisions of The DIP Facility</u>

22.   Other significant elements of the DIP Credit Agreement and the other

DIP Documents to be executed in connection therewith include the following:

(a)   <u>DIP Lender</u>:  OHorizons Global, LLC

(b)   <u>Maturity Date</u>:  365 days from the date of the execution of the DIP Loan Documents, at which time all principal and interest outstanding under the DIP Financing Facility shall be repaid.

(c)   <u>Loans</u>:  A Three Million, Seven Hundred Thousand Dollar ($3,700,000) non-revolving secured super priority multi-draw line of credit (the "Line of Credit") to be used by Debtor, solely in accordance with the Budget, (a) for working capital, (b) to pay administrative claims, (c) to fund capital improvements, (d) to lease and/or purchase equipment, merchandise, consumable inventories and other personal property, (e) pay the cost of repairs, maintenance and upkeep of the Golf & Country Club

Facilities, which include two 18-hole golf courses, a club house, cart barn, maintenance building, irrigation and pump stations, lakes, snack bar, parking areas and other facilities ancillary thereto, and (f) to pay fees, expenses and closing costs.

(d) <u>Availability</u>: The Line of Credit will be available from the closing date until the Maturity Date. Disbursements shall be made against Debtor's draw requests in a minimum amount of $50,000 each to fund permitted costs as per the Budget. Each draw request shall be accompanied by invoices for materials purchased or services rendered.

(e) <u>Interest Rates and Interest Periods</u>: The outstanding principal balance under the Line of Credit shall bear interest at a fixed rate of nine percent (9.0%) per annum. The Default Rate shall be eleven percent (11%) per annum. Interest shall be compounded monthly on the basis of a 360 day year and payable on the Maturity Date.

(f) <u>Security/Collateral</u>: All assets of Debtor, which shall include: (i) a first priority mortgage lien over Debtor's real property of, (ii) a first priority mortgage lien over a 21.6564 cuerdas parcel of land located within the Coco Beach Resort known as Parcel RM-3 owned by Debtor's affiliate, Coco Beach Holdings, Inc. in an aggregate amount not less than the amount of the Line of Credit, (iii) collateral assignment of permits, contracts and intangible property, and (iv) security interest over all the equipment, machinery, inventory and other personal property used in the operation of the Golf & Country Club Facilities.

(g) <u>Mandatory Pre-Repayment</u>: Upon the acceptance by Debtor of a bid for the sale of all or part of the Golf & Country Club Facilities to any party other than Lender or its designee, this Court entering an order for the sale of all or part of the Golf & Country Club Facilities to any party other than the DIP Lender or its designee, the execution of a letter of intent or its equivalent for the sale of all or part of the Golf & Country Club Facilities to any party other than the DIP Lender or its designee, or the sale, casualty or condemnation of all or part of the Golf & Country Club Facilities. In addition to the prepayment of the DIP Financing Facility and all interest accrued thereon, in the event of a sale to any party other than the DIP Lender, the Debtor shall pay a prepayment penalty equal to 3% of the amount prepaid.

(h)   <u>Events of Default</u>: Include but are not limited to (i) nonpayment of principal, interest and fees when due; (ii) false and /or inaccurate representations and warranties; (iii) Debtor defaulting in the observance or performance of any term, provision, covenant, warranty, agreement or condition in relation to the DIP Financing Facility (including satisfaction of milestones relating to Court approval and consummation of sale of the Golf & Country Club Facilities, specifically (i) approval of the sale by no later than December 4, 2015 and (ii) consummation of the sale by no later than December 15, 2015).

(i)   <u>Priority and Security</u>:  (i) Pursuant to Section 364(c)(1) of the Bankruptcy Code, all of the DIP Obligations (as defined in the Order) shall constitute allowed claims against Debtor with priority over any and all administrative expenses, diminution claims and all other claims against Debtor, now existing or hereafter arising, of any kind whatsoever, including, without limitation, all administrative expenses of the kind specified in Sections 503(b) and 507(b) of the Bankruptcy Code, and over any and all administrative expenses or other claims arising under Sections 105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 507(b), 546, 726, 1113 or 1114 of the Bankruptcy Code, whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy or attachment  (the "Superpriority Claims"), which allowed Superpriority Claims shall be payable from and have recourse to all pre- and post-petition property of the Debtor and all proceeds thereof, subject only to the payment of the Carve-Out to the extent specifically provided for in the Order.  Order ¶ 7.

(j)   <u>First Lien on Cash Balances and Unencumbered Property</u>. Pursuant to Section 364(c)(2) of the Bankruptcy Code, a valid, binding, continuing, enforceable, fully-perfected first priority senior security interest in and lien upon all of Debtor's pre- and post-petition property, whether existing on the Petition Date or thereafter acquired, that, on or as of the Petition Date is not subject to valid, perfected and non-avoidable liens (collectively, "Unencumbered Property"), including without limitation, all inter-company notes or inter-company receivables due to Debtor, any and all of Debtor's cash and cash collateral (whether maintained with the DIP Collateral Agent or otherwise) and any investment of such cash and cash collateral, inventory, any accounts receivable, any other right to payment whether arising before or after the Petition Date,

contracts, properties, plants, equipment, general
intangibles, documents, instruments, interests in
leaseholds, real properties, patents, copyrights,
trademarks, trade names, other intellectual property,
capital stock of all subsidiaries and the proceeds of all the
foregoing. Unencumbered Property shall also include
Debtor's claims and causes of action under Sections
502(d), 542, 544, 545, 547, 548, 549, 550, and 553 of
the Bankruptcy Code and any other avoidance actions
under the Bankruptcy Code and the proceeds thereof and
property received thereby whether by judgment,
settlement or otherwise (collectively, "Avoidance
Actions"); provided, however, that (1) upon satisfaction
in full in cash of the DIP Obligations, the DIP Liens on the
Avoidance Actions and the proceeds and property
recovered thereunder shall automatically be released, and
(2) the proceeds and property recovered or the subject of
Avoidance Actions shall only be used to pay or otherwise
satisfy any DIP Liens to the extent necessary after
commercially reasonable efforts have been undertaken by
the DIP Agents to pay or otherwise satisfy any DIP Liens
from the other Collateral. Order ¶ 9(a).

(k)     Liens Priming Prepetition Lenders' Liens. Pursuant to
Section 364(d)(1) of the Bankruptcy Code, a valid,
binding, continuing, enforceable, fully-perfected first
priority senior priming security interest in and lien upon
all of Debtor's pre- and post-petition property (including,
without limitation, any and all of Debtor's cash and cash
collateral of the Debtor (whether maintained with the DIP
Collateral Agent or otherwise) and any investment of such
cash and cash collateral, inventory, any accounts
receivable, any other right to payment whether arising
before or after the Petition Date, contracts, properties,
plants, equipment, general intangibles, documents,
instruments, interests in leaseholds, real properties,
patents, copyrights, trademarks, trade names, other
intellectual property, capital stock of subsidiaries, and the
proceeds of all the foregoing), whether now existing or
hereafter acquired, that is subject to liens securing the
debt to TDF. Such security interests and liens in favor of
the DIP Collateral Agent shall be senior in all respects to
the interests in such property of TDF arising from current
and future liens of TDF (including, without limitation, any
liens that may be granted as adequate protection), but
shall not be senior to any valid, perfected and
unavoidable interests of other parties arising out of liens,
if any, on such property existing immediately prior to the

Petition Date, or to any valid, perfected and unavoidable interests in such property arising out of liens to which the liens of TDF become or became subject to subsequent to the Petition Date as permitted by Section 546(b) of the Bankruptcy Code.  Order ¶ 9(b).

(l)  <u>Liens Junior to Certain Other Liens</u>.  Pursuant to Section 364(c)(3) of the Bankruptcy Code, a valid, binding, continuing, enforceable, fully-perfected security interest in and lien upon all of Debtor's pre- and post-petition property (other than the property described in clauses (a) or (b) of paragraph [9] of the Order, as to which the liens and security interests in favor of the DIP Collateral Agent , for its benefit and for the benefit of the DIP Secured Parties, will be as described in such clauses), whether now existing or hereafter acquired, that is subject to valid, perfected and unavoidable liens in existence immediately prior to the Petition Date (other than the liens of TDF, which shall be governed by paragraph 9(b) of the Order) or to valid and unavoidable liens in existence immediately prior to the Petition Date that are perfected subsequent to the Petition Date as permitted by Section 546(b) of the Bankruptcy Code, which liens in favor of the DIP Collateral Agent are immediately junior to such valid, perfected and unavoidable liens ("Third Party Liens").  Order ¶ 9(c); and

(m)  <u>Liens Senior to Certain Other Liens</u>.  The DIP Liens shall not be (a) subject or subordinate to (i) any lien or security interest that is avoided and preserved for Debtor's benefit and its estate under Section 551 of the Bankruptcy Code or (ii) any liens arising after the Petition Date including, without limitation, any liens or security interests granted in favor of any federal, state, municipal or other governmental unit, commission, board or court for any liability of Debtor or (b) subordinated to or made *pari passu* with any other lien or security interest under Sections 363 or 364 of the Bankruptcy Code or otherwise.  Order ¶ 9(d).

(n)  <u>Milestone Covenants</u>:  The DIP Credit Agreement requires Debtor to comply with certain milestones as stated therein, specifically (i) the approval by the Court of the sale of the Golf & Country Club Facilities by December 4, 2015, and the closing of the sale taking place by December 15, 2015.

## BASIS FOR RELIEF REQUESTED

### A.    The DIP Facility Should Be Approved

23.    Debtor proposes to obtain financing under the DIP Credit Agreement by providing security interests and liens as set forth above pursuant to Sections 364(c) and (d) of the Bankruptcy Code.  The statutory requirement for obtaining post-petition credit under Section 364(c) is a finding, made after notice and hearing, that the debtor is "unable to obtain unsecured credit allowable under Section 503(b)(1) of the [the Bankruptcy Code]." 11 U.S.C. § 364(c).  Indeed, Section 364(c) financing is appropriate when the debtor in possession is unable to obtain unsecured credit allowable as an ordinary administrative expense.  *See In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 37-39 (Bankr. S.D.N.Y. 1990) (debtor must show that it has made reasonable effort to seek other sources of financing under Sections 364(a) and (b) of Bankruptcy Code); *In re Crouse Group, Inc.*, 71 B.R. 544, 549 (Bankr. E.D. Pa. 1987) (secured credit under Section 364(c)(2) of Bankruptcy Code is authorized, after notice and hearing, upon showing that unsecured credit cannot be obtained).

24.    Courts have articulated a three-part test to determine whether a debtor is entitled to financing under Section 364(c) of the Bankruptcy Code.  Specifically, courts look to whether:

(a)    the debtor is unable to obtain unsecured credit under Section 364(b), *i.e.,* by allowing a lender only an administrative claim;

(b)    the credit transaction is necessary to preserve the assets of the estate; and

(c)    the terms of the transaction are fair, reasonable, and adequate, given the circumstances of the debtor-borrower and the proposed lender.

*In re Ames Dep't Stores*, 115 B.R. at 37-39.

25.    First, Debtor is unable to obtain unsecured credit.    Following the
Petition Date, Debtor endeavored to obtain additional financing as a bridge to the
Sale.    Because of the substantial amount outstanding under the Reimbursement
Agreement compared to the purchase price set forth in the stalking horse
purchaser's APA, the absence of substantial unencumbered assets and the
immediate need for financing, Debtor was and is cognizant that it would not be able
to obtain unsecured financing or financing junior to TDF's lien, and therefore
engaged in discussions with OHorizons regarding the terms on which it would be
willing to provide financing.    Based upon its discussions, and based upon its
knowledge of the lack of availability of other sources of financing given Debtor's
circumstances (including TDF's undersecured senior lien), Debtor has determined
that adequate post-petition financing in not available on an unsecured basis or on a
junior priority basis to TDF.

26.    Second, the financing is necessary to preserve the assets of the
estate.    As discussed herein, without post-petition financing, Debtor will be unable
to operate its businesses as a going concern or make necessary maintenance and
improvements to the Golf & Country Club, which would significantly impact Debtor's
ability to draw interest in the Auction and could jeopardize Debtor's relationship
with the PGA.    By obtaining post-petition financing, Debtor not only will preserve,
but enhance, the value of its assets pending the Sale for the benefit of interested
parties.

27.    Finally, the terms of the DIP Facility are fair, reasonable and adequate

under the circumstances.  First and foremost, Debtor is confident that, given its financial condition and the other circumstances discussed above, no other lender would be willing to provide the requisite financing on more favorable terms. Against this backdrop, Debtor carefully evaluated the proposed financing structure from the DIP Lender, engaged in negotiations with the DIP Lender regarding the proposed terms and, eventually, agreed to the terms of the DIP Credit Agreement with the DIP Lender.  The terms and conditions of the DIP Credit Agreement were negotiated by the parties in good faith and at arm's length and, as outlined above, are intended to enable Debtor to meet ongoing operational, maintenance and improvement expenses in order to preserve and maximize the value of the estate's assets through the Auction and Sale.

28.    To further illustrate that the terms are fair, reasonable and adequate, the proposed DIP Credit Agreement and the Order provide that the security interests and administrative expense claims granted to the DIP Lender are subject to the Carve-Out.  In *In re Ames Dep't Stores*, 115 B.R. 34 (Bankr. S.D.N.Y. 1990), the court found that such "carve-outs" are not only reasonable, but are necessary to ensure that official committees and the debtor's estate will be assured of the assistance of counsel.  Id. at 40.  Likewise, the various fees and charges required by the DIP Lender under the DIP Credit Agreement are customary and approval thereof is appropriate.  Indeed, courts routinely authorize similar lender incentives beyond the explicit liens and other rights specified in Section 364 of the Bankruptcy Code.  See, e.g., *In re Defender Drug Stores, Inc.*, 145 B.R. 312, 316 (9th Cir. BAP 1992) (authorizing credit arrangement under Section 364, including a lender "enhancement fee").

29.     Accordingly, each of the requirements for obtaining credit under Section 364(c) of the Bankruptcy Code are satisfied in the present case.

**B.    Approval of Priming Liens and Adequate Protection under Section 364(d)**

30.     If a debtor is unable to obtain credit under the provisions of Section 364(c) of the Bankruptcy Code, the debtor may obtain credit secured by a senior or equal lien on property of the estate that is already subject to a lien, commonly referred to as a "priming lien." 11 U.S.C. § 364(d).   Section 364(d)(1) of the Bankruptcy Code, which governs the incurrence of post-petition debt secured by senior or "priming" liens, provides that the court may, after notice and a hearing, authorize the obtaining of credit or the incurring of debt secured by a senior or equal lien on property of the estate that is subject to a lien only if—

> (a)    the trustee is unable to obtain credit otherwise; and

> (b)    there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted.

11 U.S.C. § 364(d).

31.     First, Debtor has determined that no adequate alternative to the Financing is available.  A debtor need only demonstrate "by a good faith effort that credit was not available without" the protections afforded to potential lenders by Sections 364(c) and (d) of the Bankruptcy Code.  See *In re Snowshoe Co.*, 789 F.2d 1085, 1088 (4th Cir. 1986) ("The statute imposes no duty to seek credit from every possible lender before concluding that such credit is unavailable"); see also *In re Plabell Rubber Prods., Inc.*, 137 B.R. 897, 900 (Bankr. N.D. Ohio 1992). Moreover, where few lenders are likely to be able and willing to extend necessary credit to the debtor, "it would be unrealistic and unnecessary to require [the

debtor] to conduct an exhaustive search for financing." *In re Sky Valley, Inc.*, 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988).

32.    Obtaining the financing needed by Debtor as unsecured debt or debt which would be secured by liens junior to the liens of TDF was not a realistic option due to the substantial amount outstanding under the Reimbursement Agreement, the absence of unencumbered assets and the immediate need for financing.  As set forth above, the Debtor engaged in discussions with OHorizons and the DIP Lender regarding their willingness to provide debtor-in-possession financing. Debtor has been informed that TDF is not willing to provide additional financing. The DIP Lender is willing to provide the financing only on a senior secured basis.  Debtor has determined that the best way to attract additional interest in the Auction is to preserve and enhance the going concern value of the Golf & Country Club, and the DIP Lender offered the best path to achieve that objective.

33.    Second, the determination of adequate protection is a fact-specific inquiry to be decided on a case-by-case basis.  See *In re Mosello*, 195 B.R. 277, 288 (Bankr. S.D.N.Y. 1996).  "Its application is left to the vagaries of each case . . . but its focus is protection of the secured creditor from diminution in the value of its collateral during the reorganization process." Id. (quoting *In re Beker Indus. Corp.*, 58 B.R. 725, 736 (Bankr. S.D.N.Y. 1986)); *In re Swedeland Dev. Group, Inc.*, 16 F.3d 552, 564 (3d Cir. 1994) (noting that adequate protection is required under Section 364(d)(1)(B) of the Bankruptcy Code to ensure that the creditor receives that value for which it bargained pre-bankruptcy).

34.    In this case, TDF is adequately protected.  Indeed, upon information and belief, TDF is willing to consent to the granting of senior liens to the DIP Lender

on the terms set forth in the DIP Credit Agreement and the Order. Moreover, TDF's interests are adequately protected through Debtor's use of the DIP Financing to maintain and enhance the value of the Golf & Country Club. Accordingly, Debtor submits that the interest of TDF in the Collateral is adequately protected in accordance with Section 364(d)(1)(B) of the Bankruptcy Code.

**C.** **The Requested Modification of the Automatic Stay is Appropriate.**

35.     Section 362 of the Bankruptcy Code provides for an automatic stay upon the filing of a bankruptcy petition. The DIP Documents and the Order contemplate the modification of the automatic stay to protect the DIP Lender upon the occurrence and during the continuation of any Event of Default to the extent necessary to allow the DIP Lender to promptly exercise certain rights and remedies after notice and a hearing. Stay modification provisions of this type are standard features of post-petition financing facilities and, in Debtor's business judgment, are reasonable under the present circumstances. Accordingly, Debtor respectfully requests that the Court authorize the modification of the stay in accordance with the terms set forth in the DIP Documents and the Order.

**D.** **The DIP Lender Is Entitled to the Protections of Section 364(e).**

36.     The DIP Lender is entitled to the full protections and rights afforded by Section 364(e) of the Bankruptcy Code with respect to the Financing. Section 364(e) provides that "[t]he reversal or modification on appeal of an authorization under this Section to obtain credit or incur debt … does not affect the validity of any debt so incurred … to an entity that extended such credit in good faith … unless such authorization and the incurring of such debt … were stayed pending appeal." 11 U.S.C. § 364(e).

37.     For the reasons set forth herein, it is clear that the proposed Financing is an extension of credit to Debtor made pursuant to arms' length, good faith negotiations as evidenced in the DIP Documents.   The DIP Lender is providing critical financing at a time when no other lenders are willing to do so.   Accordingly, the DIP Lender is entitled to the protections of Section 364(e) of the Bankruptcy Code.

**WHEREFORE**, Debtor respectfully requests that this Court (i) enter the Order granting the relief requested herein, and (ii) grant such other relief as is just and proper.

## <u>NOTICE</u>

**TO PARTIES IN INTEREST:**

Within fourteen (14) days after services as evidenced by the certification, and an additional three (3) days pursuant to Fed.R.Bank.P. 9006(f) if you were served by mail, any party against whom this Motion has been served, or any party to the action who objects to the relief sought herein, shall serve and file an objection or other appropriate response to this Motion with the Clerk's office of the U.S. Bankruptcy Court for the District of Puerto Rico. If no objection or other response is filed within the time allowed herein, the Motion will be deemed unopposed and may be granted unless: (i) the requested relief is forbidden by law: (ii) the requested relief is against public policy; or (iii) in the opinion of the Court, the interest of justice requires otherwise.

**CERTIFICATE OF SERVICE:** I hereby certify that on this same date, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all CM/ECF participants in this

case, including, but not limited to, the U.S. Trustee.  Copy of the Motion and its
Exhibits will be sent by First Class Mail to those parties listed on the Debtor's List of
Creditors Holding the 20 Largest Unsecured Claims; to the **Civil Process Clerk**,
Bankruptcy Unit, Office of the U.S. Attorney for the District of Puerto Rico, Torre
Chardón Suite 1201, 350 Carlos E. Chardón Street, San Juan, PR 00918; **Attorney
General of the United States**, Department of Justice for the State of Washington,
950 Pennsylvania Avenue, NW, Washington DC 20530-0001; **Internal Revenue
Service**, PO Box 7346, Philadelphia, PA 19101-7346; **Centro de Recaudación de
Ingresos Municipales**, Legal Division, Att. Carmen B. Figueroa, Esq., PO Box
195387, San Juan, PR 00919-5387, via e-mail cfigueroa@crimpr.net and
cpfbkcy@gmail.com; **Department of Justice**, Commonwealth of Puerto Rico, Att.
Migda L. Rodríguez Collazo, Esq., PO Box 9020192, San Juan, PR 00902-0192, via
e-mail bankruptcyjusticia.gobierno.pr@gmail.com and mlrcbankruptcy@gmail.com;
**Melba Acosta Febo***, President of Puerto Rico Tourism Development Fund*,
melba.acosta@bgfpr.com , PO Box 42001, Minillas Station, San Juan, PR 00940-
2001; and to **OHorizons Global, LLC**, through **Harry O. Cook, Esq**. and
**Alejandro J. Cepeda, Esq.**, McConnel Valdés, LLC, 270 Muñóz Ave., San Juan, PR
00918, via e-mail hoc@mcvpr.com and ajc@mcvpr.com, respectively;  to
**Municipality of Río Grande,**  PO Box 847 Rio Grande, PR 00745; to the
**Executive Director of Puerto Rico Tourist, Educational, Medical and
Environmental Central Facilities Financing Authority c/o Government
Development Bank for Puerto Rico**, Roberto Sánchez Vilella Government Center,
De Diego Avenue and Baldorioty De Castro, Stop 22, San Juan, PR 00911; to the
**Trust Division, Banco Popular de Puerto Rico**, PO Box 167708, San Juan, PR

00911; and to the ***Executive Director, Puerto Rico Tourism Development***

***Fund c/o Government Development Bank for Puerto Rico,*** through ***Luis C.***

***Marini Biaggi, Esq.,*** O'Neill & Borges, LLC, 250 Muñoz Rivera Avenue, Suite 800,

San Juan, PR 00918-1813.

San Juan, Puerto Rico, this 8th day of October, 2015.

<u>**S/ CHARLES A. CUPRILL-HERNÁNDEZ**</u>
**USDC-PR 114312**
CHARLES A. CUPRILL, P.S.C, LAW OFFICES
356 Fortaleza Street, Second Floor
San Juan, PR 00901
Tel.: (787) 977-0515
Fax: (787) 977-0518
E-Mail: <u>ccuprill@cuprill.com</u>